IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JOSEPH SEBASTIAN HANSON, | ) | Civil No.: 3:15-cv-01974-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

       Merrill Schneider
       Schneider Kerr & Gibney Law Offices
       P.O. Box 14490
       Portland, OR 97293

             Attorney for Plaintiff

       Billy J. Williams, U.S. Attorney
       Janice Hebert, Asst. U.S. Attorney
       1000 S.W. 3rd Avenue, Suite 600
       Portland, OR 97204

Erin F. Highland
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221 A
Seattle, WA 98104-7075

   Attorneys for Defendants

JELDERKS, Magistrate Judge:

   Plaintiff Joseph Sebastian Hanson brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision of the Commissioner of Social Security (the

Commissioner) partially denying his application for a period of disability, disability insurance

benefits, and Supplemental Security Income under Titles II and XVI of the Social Security Act

(the Act). Plaintiff seeks an Order remanding the action to the Social Security Administration

(the Agency) for an award of benefits. In the alternative, Plaintiff seeks a remand for further

proceedings.

   For the reasons set out below, the Commissioner's decision should be AFFIRMED.

## **Procedural Background**

   Plaintiff filed an application for a period of disability and disability insurance benefits on

August 31, 2011. Plaintiff also filed an application for supplemental security income on August

31, 2011. Plaintiff alleged disability beginning August 31, 2009 in both applications.

   After his claims were denied initially and upon reconsideration, Plaintiff timely requested

an administrative hearing.

   On June 14, 2013, a hearing was held before Administrative Law Judge (ALJ) S. Andrew

Grace. Plaintiff and Kay Wise, a Vocational Expert (VE), testified at the hearing. Plaintiff was

represented by counsel.

FINDINGS AND RECOMMENDATION – 2

On January 15, 2014, a second hearing was held before ALJ Grace. Plaintiff, Donald L. Plowman, M.D., a medical expert, and Gary Jesky, a VE, testified at the hearing. Plaintiff was represented by counsel.

In a decision dated March 4, 2014, ALJ Grace found that Plaintiff was disabled within the meaning of the Act from September 16, 2011 through November 11, 2013. Plaintiff was not disabled from August 31, 2009 to September 15, 2011 and disability ended on November 12, 2013.

On August 18, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born in 1973 and was 41 years old at the time the ALJ issued his decision. He completed the 12th grade and has past relevant work as a night stocker, a gas station attendant, and a baker (head baker).[1]

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which are also described in *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is

---

[1] There is some dispute as to whether Plaintiff completed high school. This is addressed in section III.B. infra.

not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform relevant work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(f).

Step Five.  The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines, 20

C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant

number of jobs exist in the national economy that the claimant can do, the claimant is not

disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R.

§ 404.1520(g)(1).

At Steps One through Four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at

1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy. *Id.*

## Medical Record and Testimony

The Court has carefully reviewed the medical record and testimony and the parties are

familiar with both. Accordingly, the details of that evidence will be set out below only as they

are relevant to the issues before the Court.

## ALJ's Decision

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of

the Act through January 30, 2012.

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since his alleged onset of disability on August 31, 2009.

At the second step, the ALJ found that Plaintiff had the following severe medical

impairments: degenerative disc disease of the cervical spine, obesity, posttraumatic stress

disorder (PTSD), and borderline intellectual functioning.

At the third step, the ALJ found that from September 16, 2011 through November 11,

2013 Plaintiff's degenerative disc disease of the cervical spine met the criteria set out in Listing

1.04A. 20 C.F.R. Part 404, Subpart P, App. 1. From August 31, 2009 through September 15,

2011, Plaintiff did not have any impairment or combination of impairments that met or equaled a

presumptively disabling impairment set out in the listings. Beginning November 12, 2013, Plaintiff did not have any impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings.

The ALJ next assessed Plaintiff's residual functional capacity (RFC). He found that from August 31, 2009 through September 15, 2011, and again beginning on November 12, 2013, Plaintiff retained the capacity to perform less than the full range of sedentary work. Further:

> He should never climb ladders, ropes, or scaffolding, and should only occasionally climb ramps and stairs. He could occasionally balance, stoop, kneel, crouch, and crawl. He was/is limited to occasional overhead reaching bilaterally. He was/is limited to frequent handling and fingering with the non-dominant, left upper extremity. He should have no contact with the public and only occasional contact with coworkers. He was/is limited to simple, routine, and repetitive tasks.

In determining Plaintiff's RFC, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible.

At the fourth step of his disability analysis, the ALJ found that Plaintiff was unable to perform past relevant work.

At the fifth step, the ALJ found that Plaintiff retained the functional capacity required to perform jobs that existed in significant numbers in the national economy. Based upon the VE's testimony, the ALJ cited addresser, and mail sorter as examples of work Plaintiff could perform. Based upon the conclusion that Plaintiff could perform such work, the ALJ found that Plaintiff was not disabled, within the meaning of the Act, from August 31, 2009 through September 15, 2011 and after November 12, 2013.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). Claimants bear the initial burden of establishing disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. *Tackett*, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. The Court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ improperly rejected the opinions of Donald Plowman, M.D. and Heather Bee, Psy.D; failed to properly credit Plaintiff's statements; failed to present a hypothetical to the VE that fully reflected Plaintiff's impairments; and improperly found medical improvement.

## I. Evaluating Medical Opinion

Plaintiff contends that the ALJ improperly rejected the opinions of Drs. Plowman and Bee.

///

**A. Standards**

The ALJ is required to consider all medical opinion evidence and is responsible for resolving conflicts and ambiguities in the medical testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). In reviewing an ALJ's decision, the Court does not assume the role of fact-finder, but instead determines whether the decision is supported by substantial evidence in light of the record as a whole. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir.1992).

Because treating physicians have a "greater opportunity to know and observe" their patients, their opinions are given greater weight than the opinions of other physicians. *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions, *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995); and must provide "specific, legitimate reasons . . . based upon substantial evidence in the record" for rejecting opinions of a treating physician which are contradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989) (citations omitted). An ALJ may "reject the opinion of a non-examining physician by reference to specific evidence in the record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998).

**B. Dr. Plowman**

Plaintiff contends that the ALJ improperly rejected the opinion of the non-examining medical expert, Dr. Plowman. Dr. Plowman appeared by phone at the second hearing on January 15, 2014 as a non-examining expert witness. Tr. 89, 91. Dr. Plowman reviewed the record before offering his opinion. Tr. 92.

Dr. Plowman opined that Plaintiff's medically determinable impairments met listing 1.04. Tr. 96. He found that the onset date was January, 2011, primarily basing his opinion on an MRI and Raymond Golish, M.D.'s, subsequent observations. Tr. 93, 96. Dr. Plowman noted that in

"February of 2011 [Plaintiff] had an MRI scan done which was significantly abnormal with the disk at 5–6 with some foraminal stenosis." Tr. 93. Further, Dr. Plowman noted that Dr. Golish saw Plaintiff on July 7, 2011, finding that Plaintiff "had problems but [was] not a candidate for surgery . . . ." Tr. 94. Dr. Golish made a similar determination on July 29, 2011, but found Plaintiff's left arm, left upper arm, thumb, and index pain were worse on September 16, 2011. Tr. 94. On September 16, 2011 Dr. Golish found that Plaintiff had a positive Spurling test, and pain that radiated down Plaintiff's arm with extension and lateral bending in the left arm. Tr. 94. Plaintiff was a candidate for surgery on September 16, 2011. Tr. 94.

Dr. Plowman concluded that Plaintiff's disability onset date was January, 2011. Tr. 96. He reasoned that ordering the MRI in February 2011, the subsequent doctor's visits to evaluate whether Plaintiff had a "significant problem," and later finding a "significant problem," suggested that Plaintiff's onset date was in January, 2011. Tr. 96.

Dr. Plowman found that Plaintiff was not disabled from August 31, 2009 to January, 2011. Tr. 97. He reasoned that "[t]he only evidence in these records of that is several visits where he was complaining of shoulder pain, but there were no evaluations to indicate what was going on during that period of time." Tr. 98. While Dr. Plowman noted that Plaintiff did have lower back problems during that period of time, Plaintiff also worked "as a filling station attendant." Tr, 98. Plaintiff may have had some limitations but "trying to retroactively construct what was going on during that period of time" was difficult. Tr. 98. Dr. Plowman concluded that he did not "really have the objective findings in the records . . . to make a definite decision." Tr. 98.

With respect to the time period after Plaintiff's surgery on October 17, 2013, Dr. Plowman opined that the surgery's expected outcome was "quite good" in eighty to ninety

percent of people. Tr. 97. Plaintiff's "neurological symptoms should improve significantly." Tr. 97. Dr, Plowman did not have any follow-up evidence to justify his conclusion. Tr. 97.

The ALJ gave some weight to Dr. Plowman's opinion, finding that Plaintiff's degenerative disc disease of the cervical spine began to meet listing 1.04A on September 16, 2011, rather than January, 2011. Tr. 37. As stated by Plaintiff, the ALJ may reject the opinion of a non-examining medical expert by reference to specific evidence in the medical record. Pl.'s Br. at 7 (citing *Sousa*, 143 F.3d at 1244). The ALJ met this standard.

First, addressing the time period between January 2011 and September 16, 2011, the ALJ discounted Dr. Plowman's opinion by citing several pieces of specific evidence in the medical record. Tr. 37. A 1.04A listing is in part characterized by "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss . . . ." 20 C.F.R. Part 404, Subpart P, App. 1. The ALJ stated that in January 2011 Matthew Rose, D.O., "noted that on examination, the claimant's reflexes were normal and his strength was 5/5 bilaterally in the upper and lower extremities." Tr. 37 (discussing Tr. 1008). In April 2011, Dr. Rose found that Plaintiff's neck had a normal range of motion and his neurological examination was normal. Tr. 1006–07. In June 2011, medical notes state that Plaintiff was helping a friend move and attempted to lift a heavy box. Tr. 777. In July 2011, Dr. Golish found that Plaintiff had "5/5 strength in shoulder abduction, elbow flexion, elbow extension, wrist extension, finger flexion, finger abduction, bilaterally with symmetric biceps, triceps, and brachioradialis . . . ." Tr. 888. Dr. Golish also noted in July 2011 that Plaintiff's subjective pain reports were "nondermitomal and only partially consistent [with his] herniated disc." Tr. 889. Finally, the ALJ observed that Mr. Abraham Abu, PA-C, found that in August 2011 Plaintiff had 5/5 strength in "upper extremities and also lower extremities bilaterally." Tr. 883.

Contrary to Plaintiff's assertions, the ALJ rejected Dr. Plowman's opinion by reference to specific evidence in the medical record. Tr. 37. Plaintiff cherry picks findings in Drs. Rose and Golish's examinations to argue that Dr. Plowman's findings should not have been discounted. Pl.'s Reply Br. at 1–2. But the Court finds the ALJ's discussion of Drs. Rose and Golish's findings sufficient to meet the specific evidence standard even if some of their findings may support giving weight to Dr. Plowman's opinion. *See Veira v. Berrybill*, No. 2:15–cv–1685 DB, 2017 931808, at *6 (E.D. Cal. Mar. 9, 2017) (finding that ALJ properly discounted non-examining medical expert's onset opinion by noting that claimant played softball and that treating physician opined that claimant could work after alleged onset date); *Nabhani v. Colvin*, Case No.:C–13–0211 JSC, 2014 WL 940546, at *10 (N.D. Cal. Mar. 5, 2014) (finding that ALJ properly discounted non-examining medical expert's onset opinion by referencing specific evidence that there was no ongoing problem with panic attacks). To the extent that the ALJ relied on Mr. Abu's medical notes—a physician's assistant's notes and an "other" source under the rules—Plaintiff does not argue that this invalidates the ALJ's otherwise valid references to specific evidence in the medical record. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless); 20 C.F.R. § 404.1513(d). Moreover, while Social Security Ruling (SSR) 83-20 requires an ALJ to rely upon a medical opinion to determine onset date, this does not mean that an ALJ may not discount that opinion using specific evidence. *See Nabhani*, 2014 WL 940546, at *10. In short, the ALJ properly discounted Dr. Plowman's opinion with regard to the time period between January 2011 and September 16, 2011.

Second, addressing the time period before January 2011, the ALJ properly discounted Dr. Plowman's opinion that Plaintiff "might not have been able to perform a job where he would

have needed to extend his neck repetitively on more than an occasional basis . . . [as] extremely equivocal." Tr. 38. Dr. Plowman offered a "supposition" that Plaintiff may have had limitations "about 2010 I think." Tr. 98. These limitations would have included not being able to work a job that involved extending his neck and issues looking up and down or side to side. Tr. 98–99. But as the ALJ recognized, Dr. Plowman himself stated that he did not "really have the objective findings in the records to, to make a definite decision." Tr. 98.

Considering Dr. Plowman's statements together, the Court agrees with the ALJ's assessment and finds that the ALJ referenced specific evidence in the medical record. Plaintiff attempts to cite portions of the record that support finding neck limitations prior to January 2011. Pl.'s Br. at 7–8. But, in doing so, Plaintiff asks the Court to not only invalidate the ALJ's assessment but to invalidate Dr. Plowman's assessment. Dr. Plowman found that he could not "make a definite decision" with respect to the limitations prior to January 2011. Tr. 98. The ALJ has referenced specific evidence in the record and appropriately considered Dr. Plowman's non-examining medical opinion.

## C. Dr. Bee

Plaintiff also contends that the ALJ improperly rejected the opinion of Plaintiff's examining psychologist, Dr. Bee. Dr. Bee examined Plaintiff on January 13, 2013. Dr. Bee's evaluation included a structured clinical interview, WAIS IV test, 21 Item Test, Neuropsychological Assessment Battery (NAB) Memory Module, Trials A and B, Stroop Color and Word Test, PTSD Checklist, Personality Assessment Inventory (PAI), and reviewed a psychological evaluation done by James B. Powell, Psy.D. in September 2006. Tr. 1028.

Dr. Bee diagnosed Plaintiff with PTSD, Undifferentiated Somatoform Disorder (Rule Out), and Borderline Intellectual Functioning. Tr. 1041. Dr. Bee opined that Plaintiff had a

personal weakness in processing speed, and that reasoning and comprehension would be far more difficult for Plaintiff than his peers. Tr. 1042. Plaintiff's health complaints were likely to be chronic and accompanied by fatigue and weakness. Tr. 1042. His health complaints would leave him unable to perform minimal role expectations. Tr. 1042. Plaintiff would "function best in a quiet, predictable, low stress environment." Tr. 1044. He needs tasks to be broken into individual steps that can be completed one at a time, rather than being given a series of instructions that must be remembered and followed one after another. Tr. 1044.

The ALJ gave very little weight to Dr. Bee's opinion. Tr. 38. Plaintiff takes issue with the ALJ's determination, arguing that the ALJ failed to provide clear and convincing reasons supported by substantial evidence for rejecting Dr. Bee's opinion. Putting aside whether the ALJ validly discounted Dr. Bee's opinion, the Commissioner argues that the RFC appropriately reflects all necessary limitations in Dr. Bee's opinion.

The Court agrees with the Commissioner in so far as Plaintiff has failed to identify how Dr. Bee's opinion conflicts with the RFC. *See Ryan-Werry v. Colvin*, 641 Fed. Appx. 684, 688 (9th Cir. 2015) (finding harmless error where Plaintiff failed to identify how or why improperly discredited testimony would alter the ALJ's RFC determination); *Stout*, 454 F.3d at 1055 (noting that harmless error applies where the improper findings were "inconsequential to the ultimate nondisability determination"). First, an ALJ need not incorporate limitations phrased equivocally into the RFC. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 691-92 (9th Cir. 2009) (finding that where doctor's recommendation did not indicate that claimaint was incapable of working *except* under the recommended conditions the recommendation was neither a diagnosis nor a statement of claimant's functional capacity); *Glosenger v. Comm'r of Soc. Sec. Admin.*, No. 3:12–cv–1774–ST, 2014 WL 1513995, at *6 (D. Or. Apr. 16, 2014) ("Dr. Dean's list of

accommodations were couched as mere 'recommendations,' which, while useful in determining Glosenger's ideal work environment, are distinct from her functional capacity which the RFC is designed to capture").

Here, as the Commissioner points out, a number of Dr. Bee's recommendations address Plaintiff's ideal work environment rather than his functional capacity. Dr. Bee states that Plaintiff "will function *best* in a quiet, predictable, low stress environment." Tr. 1044 (emphasis added). Plaintiff's "work *should* be completed independent of reliance on coworkers." Tr. 1044 (emphasis added). "Provisions *may* be needed for flexible breaks to control stress and anger levels." Tr. 1044 (emphasis added). Plaintiff "*may* need to avoid multitasking, or doing several things at once." Tr. 1044 (emphasis added). The Court finds that Dr. Bee's equivocal recommendations need not be incorporated into the RFC.

Second, the Court finds that Dr. Bee's other limitations are consistent with the RFC. Plaintiff argues that two limitations were not reflected in the RFC: Plaintiff's need for extra time to satisfactorily complete tasks, and Plaintiff's limited ability to understand, remember, and carry out complex instructions. The Commissioner argues that these limitations are consistent with the ALJ's limitation to simple, routine, and repetitive tasks.

The Court agrees with the Commissioner. As in *Stubbs-Danielson v. Astrue*, the Court finds that the RFC's limitation to simple, routine, and repetitive tasks is consistent with the limitations identified in the medical testimony. 539 F.3d 1169, 1174 (9th Cir. 2008) (finding that an RFC limitation to simple tasks adequately captured restrictions related to concentration, persistence, or pace where the assessment was consistent with the medical evidence). Further, as the Commissioner points out, an RFC need not parrot Dr. Bee's assessed limitations, only be consistent with them. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010).

The Court finds that, even if the ALJ improperly discounted Dr. Bee's medical opinion, the ALJ's error was harmless given that Plaintiff has failed to identify how Dr. Bee's opinion is inconsistent with the RFC. *See Ryan-Werry*, 641 Fed. Appx. at 688; *Stout*, 454 F.3d at 1055.

## II. Credibility Determination

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons, supported by substantial evidence, for finding that his allegations were not fully credible.

### A. Standards

Where a claimant has alleged disability based on subjective symptoms and produced objective medical evidence of an underlying impairment which could reasonably be expected to produce the alleged pain "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281.

As Plaintiff points out, under SSR 16-3p, *available at* 2016 WL 1119029 (Mar. 16, 2016) (superseding SSR 96-7p), ALJs are no longer tasked with making an overarching credibility determination, and must assess instead whether a claimant's subjective symptom statements are consistent with the record as a whole. The ALJ's decision in this case was made long before SSR 16-3p became effective, raising the question of whether SSR 16-3p applies retroactively.

While district court rulings are inconsistent, I have held that SSR 16-3p is a clarification of sub-regulatory policy—rather than a new policy—making SSR 16-3p's clarification relevant to the case at hand. *Kunkle v. Colvin*, Civil No.: 6:14–cv–01605–JE, 2016 WL 8229041, at *4 (D. Or. Dec. 13, 2016) (applying SSR 16-3p retroactively); *Mesecher v. Colvin*, Civil No.: 6:14–cv–01578–JE, 2016 WL 6666800, at *4 (D. Or. Nov. 10, 2016) (same); *Andre v. Colvin*, 6:14–cv–02009–JE (D. Or. Oct. 13, 2016) (same). *Compare Ashlock v. Colvin*, CASE NO. 3:15-cv-

05767 DWC, 2016 WL 3438490, at *5 n.1 (W.D. Wash. June 22, 2016) (declining to apply SSR 16-3p to an ALJ decision issued prior to the effective date), *with Lockwood v. Colvin*, No. 15 C 192, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016) (applying SSR 16-3p retroactively to a 2013 ALJ decision).

The new SSR clarifies that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p at *1. In other words, "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* at *10. Rather, "[a]djudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id.* Thus, "it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered . . . .'" *Id.* at *9. Instead, the finding "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." *Id.*

In evaluating a claimant's subjective symptom testimony, an ALJ must consider the entire record and consider several factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; medications taken and their effectiveness; treatment other than medication; measures other than treatment used to relieve pain or other symptoms; and "other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). If substantial evidence supports the ALJ's determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct. *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

**B. Analysis**

In a pain and fatigue questionnaire dated November 16, 2009, Plaintiff reported that he had persistent aching, burning, stabbing, and shooting pain. Tr. 339. Moving around made the pain worse and, at times, he had to rest for several hours. Tr. 339. He was only able to be up and active for twenty minutes before he needed to rest. Tr. 339.

At the hearing on June 14, 2013, Plaintiff testified that while he had back problems his whole life, they became much worse in August of 2009. Tr. 60–62. In August 2009 his shoulders were weak and then in 2010 he began to have difficulty standing up. Tr. 62. He later had problems bending his neck and his ability to lift things has "cut in half or even more." Tr. 63. He had difficulty going outside with his child because of his problems standing. Tr. 63. "It just feels like somebody is sitting on [his] shoulders squeezing them." Tr. 63.

On October 17, 2013, Plaintiff underwent a C5-6 anterior cervical discectomy and fusion, anterior fixation, machined 6-mm lordotic allograft with demineralized bone matrix. Tr. 1099. At the hearing following surgery, Plaintiff reported that the surgery "fixed the problems in [his] hand" and the "main pain." Tr. 100–01. However, he stated "I mean it fixed the problems in my hand, you know, now I got this tingling and stuff going all the way from my neck down to my arm and I got it under my shoulder blade now and I got it on the back like this lump right here." Tr. 100. He reported pain on the top of his shoulder, his neck, and pain into his arm. Tr. 101–02. He had difficulty lifting a quart of milk, difficulty going on walks, and he wore out easily. Tr. 100–01. His activity was "a little more limited then it was and it just seem[ed] like [he] tired out eas[ily]." Tr. 104. He stated, "It – when I'm like up I mean I do do cooking and stuff of course and I have to go sit down after about five minutes, it just feels like somebody's bearing, just sitting on my shoulders." Tr. 104.

The ALJ found the Plaintiff was not credible and accorded his statements very little weight. The ALJ offered several reasons in support of his finding that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were inconsistent with the record as a whole.

First, the ALJ cited Plaintiff's drug-seeking behavior, and the possibility that he had engaged in such behavior for secondary gain. Tr. 39. In January of 2009, William R. Fraser, MD, noted that "[t]his patient is very well known to our facility." Tr. 808. Plaintiff "has a history of very frequent emergency department visits for various pain related problems." Tr. 808. Plaintiff has "been discharged from some of the practices in the community and has a history such that it is extremely risky . . . to continue with narcotic prescribing for him." Tr. 808. In July of 2009, a physician's assistant noted, "[r]eview of the patient's past medical history reveals recurrent visits to multiple providers in the area with requests for narcotic prescriptions for several complaints, including back injuries as well as dental pain, et cetera." Tr. 437. Plaintiff reported that "he was recently discharged from Debra Minchow's office for drug-seeking behavior." Tr. 437. In September of 2009, Tavis Cowan, MD, found that Plaintiff "frequently requests narcotic pain medication-especially hydrocodone." Tr. 459. He was "quite focused on pain issues . . . [and] allude[d], multiple times to 'something for [his] pain." Tr. 460–61. That same month, Richard B. Ismach, MD, noted that Plaintiff had been to the emergency department sixteen times in the last year in Dr. Ismach's hospital system. Tr. 788. In August of 2010, Helen Le Vann, MD confronted Plaintiff with "7 pages of ER visits" related to Plaintiff's shoulder and neck pain, after Plaintiff had denied being seen for shoulder and neck pain. Tr. 473. Dr. Le Vann told Plaintiff she would not prescribe narcotics for Plaintiff's complaints because she "felt strongly that he was a drug seeker." Tr. 473. There are notations related to drug seeking behavior

throughout the record. *See e.g.* Tr. 593 (dated April 27, 2009); Tr. 586 (dated July 27, 2010); Tr. 947 (dated November 19, 2010); Tr. 582 (dated February 22, 2011); Tr. 581 (dated February 28, 2011); Tr. 615 (dated March 2, 2011).

Further, with respect to the time period after the ALJ found Plaintiff's impairments no longer met Listing 1.04A, Plaintiff was prescribed oxycodone by Martin Degroot, PAC, on November 11, 2013. Tr. 1126. The oxycodone was supposed to last one week. Tr. 1126. Plaintiff returned the next day to request additional pain medication. Tr. 1111. Plaintiff stated that he had been taking his hydrocodone but it was not covering his pain.[2] Tr. 1111. Plaintiff was reminded that his prescription was intended to last one week. Tr. 1112. The record does not contain treatment records after this visit.

As noted by the ALJ, there is also some evidence that Plaintiff has engaged in drug seeking behavior for secondary gain. On April 1, 2013, Philip Grasso, ND, noted that the clinic received a message that Plaintiff had been selling his prescription medications. Tr. 1055. The DEA was contacted. Tr. 1055. Further, on April 19, 2013, a drug screen found that Plaintiff tested positive for marijuana and methadone, but negative for his prescribed oxycodone. Tr. 1051. Dr. Grasso subsequently refused to continue prescribing Plaintiff narcotics for his pain. Tr. 1051.

The ALJ properly considered Plaintiff's drug seeking behavior and this behavior was a clear and convincing reason to discount Plaintiff's credibility supported by substantial evidence. *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (a claimant's drug seeking behavior may be a clear and convincing reason to discount the claimant's testimony). Plaintiff

---

[2] It is unclear why Plaintiff was prescribed oxycodone, but Plaintiff complained about his hydrocodone the following day.

argues that the ALJ rejected Plaintiff's subjective statements because the ALJ found that Plaintiff's drug seeking behavior was demonstrative of untruthfulness—an improper reason for rejecting claimant statements under SSR 16-3p. Pl.'s Br. 14. However, SSR 16-3p clarifies that "adjudicators will not assess an individual's *overall* character or truthfulness in the manner typically used during an adversarial court litigation." *Id.* at 10 (emphasis added). Plaintiff's drug seeking behavior was not an assessment of Plaintiff's overall character but, as the ALJ put it, directly "undermine[d] [Plaintiff's] descriptions of his pain to both treating and examining providers." Tr. 39; *see also* SSR 16-3p at 10 ("Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments.").

Plaintiff's attempts to address the ALJ's drug seeking behavior determination on its merits are equally unavailing. Plaintiff points to an instance prior to Plaintiff's onset date where Plaintiff "stormed out of the exam room" after he was denied pain treatment; an instance prior to Plaintiff's onset date where a clinic determined that Plaintiff exhibited drug seeking behavior; and an instance where Dr. Poolman assessed Plaintiff with drug seeking behavior only to have a subsequent MRI determine that Plaintiff had some spinal issues. Pl.'s Reply Br. at 6. Plaintiff argues these three instances reflect genuine efforts to get treatment rather than drug-seeking behavior. *Id.* at 6. But even if these instances do not reflect drug-seeking behavior, the Court cannot ignore the numerous other instances where Plaintiff exhibited drug-seeking behavior. *See e.g.* Tr. 459, 473, 616, 947, 1051. Plaintiff's drug seeking behavior was a clear and convincing

reason to discount his testimony and supported by substantial evidence. *See Edlund*, 253 F.3d at 1157.[3]

Second, the ALJ cited numerous inconsistencies in the record. Tr. 39. In particular, the ALJ noted that Plaintiff's "reports regarding the onset of his shoulder pain vary dramatically throughout the record." Tr. 39. In October of 2010, Plaintiff complained of shoulder and neck pain that started one month prior. Tr. 781. In November of 2010, Plaintiff complained of shoulder pain that started a year prior. Tr. 947. In February of 2011, Plaintiff complained of shoulder pain starting at least two years prior. Tr. 934. In August of 2011, Plaintiff complained of neck pain that started seven years prior. Tr. 881. Then in September of 2013, Kim Webster, MD, observed that there was some evidence of poor effort, there were inconsistencies in Plaintiff's range of motion, and Plaintiff engaged in pain behavior. Tr. 39.

The ALJ's consideration of Plaintiff's varying descriptions of his pain was a clear and convincing reason to discount Plaintiff's credibility. SSR 16-3p at 8. While "inconsistencies in an individual's statements made at varying times do[] not necessarily mean they are inaccurate" the record as a whole support's the ALJ's determination. *Id.* Plaintiff's varying statements coupled with Dr. Webster's pain behavior finding, amount to a clear and convincing reason to discount Plaintiff's credibility. *Id.*; *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (noting that self-limiting behaviors strongly suggest a lack of credibility).

Third, the ALJ noted that "the record contains multiple references to activities of the claimant which are highly inconsistent with his allegations." Tr. 40. Plaintiff fell off a skateboard

---

[3] Plaintiff's attempts to distinguish *Edlund* are also unavailing as *Edlund* does not suggest that it is limited to its specific facts. *See Morreo v. Colin*, No. CV 13–00668 RZ, 2013 WL 5966768, at *2 (C.D. Cal. Nov. 7, 2013) ("nothing in Edlund suggests that Carl Edlund's credibility in 'over-reporting' his pain could only be discounted because he traded his prescription pain pills for Valium").

in August, 2010. 786. Shortly thereafter, Plaintiff helped a friend move a refrigerator. Tr. 781. In November 2010, Plaintiff fell off a ladder. Tr. 947. In June 2011, Plaintiff helped a friend move a heavy box. Tr. 777. In March, 2013, Plaintiff reported walking sixteen miles in a single day. Tr. 1058. These activities permit the ALJ to infer that Plaintiff was not as physically limited as his allegations suggested. *Tommasetti*, 533 F.3d at 1040.

Based upon careful review of the ALJ's decision and the record, I conclude that the ALJ provided clear and convincing reasons supporting his decision to not fully credit Plaintiff's subjective symptom testimony. However the ALJ also provided other reasons that were not legally sufficient. First, while much of the ALJ's discussion of inconsistencies in the record went directly to Plaintiff's pain and limitations—as discussed above—some of the ALJ's discussion improperly addressed Plaintiff's overall truthfulness. For example, the ALJ noted that Plaintiff testified that he had no friends while he stated at another point in time that he had two friends. Tr. 39. The ALJ also noted that Plaintiff testified that he used marijuana up to three times a week but the record showed that Plaintiff was "inconsistent in his reporting of his illicit drug history." Tr. 39. The ALJ's truthfulness analysis was improper under SSR 16-3p.

Second, the ALJ cited Plaintiff's history of declining alternative modalities of treatment. Tr. 39. In February of 2011, Plaintiff declined neurontin for his pain. Tr. 581. In August of 2011, Plaintiff was given the option of spinal injections and physical therapy but he declined these treatments focusing instead on "monotherapy with the use of opioid analgesics." Tr. 883. In November of 2013, Plaintiff was offered "NSAID options and neurological pain reliever, [but he] deferred." Tr. 1112.

The ALJ erred by not fully evaluating Plaintiff's history of declining alternative modalities to treatment in determining adverse credibility. An ALJ may consider a claimant's

failure to seek treatment. *Smolen*, 80 F.3d at 1284. However, under SSR 16-3p, an ALJ "will not find an individual's symptom's inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* at 8. For example, "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services." *Id.* at 9. There is at least some evidence of Plaintiff's inability to afford treatment in the record. Tr. 600 (Plaintiff informed a healthcare worker via phone that "he could not afford to pay for [appointments] himself"). There is also some evidence that Plaintiff may not be able to tolerate NSAIDs. Tr. 1060. As the ALJ failed to fully consider reasons why Plaintiff did not seek treatment via alternative modalities, the ALJ erred.

Nonetheless, the ALJ's inclusion of insufficient reasons does not invalidate his finding that Plaintiff's subjective symptom testimony should be discounted. Where, as here, substantial evidence supports the ALJ's determination despite the inadequacy of some of an ALJ's reasons, that determination will be upheld. *See Carmickle*, 533 F.3d at 1162.

### III. Hypothetical to the VE

Plaintiff contends that the ALJ failed to present a hypothetical to the VE that fully reflected Plaintiff's impairments.

### A. Standards

At step five "the Commissioner has the burden to identify specific jobs existing in substantial numbers in the national economy that a claimant can perform despite his identified limitations." *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015) (internal quotations and citations omitted). The ALJ assesses the claimant's RFC and then considers potential occupations that the claimant may be able to perform. *See* 20 C.F.R. § 416.969. To make this

determination, "the ALJ relies on the Dictionary of Occupational Titles ("DOT"), which is the SSA's primary source of reliable job information regarding jobs that exist in the national economy." *Zavalin*, 778 F.3d at 845–46 (internal quotations and citations omitted). Among other things, the DOT sets out the reasoning ability required to perform each job, "ranging from Level 1 (which requires the least reasoning ability) to Level 6 (which requires the most)." *Id.* at 846.

"In addition to the DOT, the ALJ relies on the testimony of [VEs] who testify about specific occupations that a claimant can perform in light of his [RFC]." *Zavalin*, 778 F.3d at 846. The ALJ presents a vocational hypothetical to the VE, which must set out all of a claimant's impairments and limitations. *E.g., Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). The ALJ's depiction of a claimant's limitations must be "accurate, detailed, and supported by the record." *Tackett*, 180 F.3d at 101. If the assumptions set out in the hypothetical are not supported by the record, a VE's conclusion that a claimant can work does not have evidentiary value. *Gallant*, 753 F.3d at 1456.

Further, "[w]hen there is an apparent conflict between the [VE's] testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency." *Zavalin*, 778 F.3d at 846 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1153–54 (9th Cir. 2007)). The ALJ must have the VE explain the conflict and determine whether the VE's explanation is reasonable prior to relying on the VE's testimony to reach a disability determination. *Id.* The ALJ's failure to resolve any inconsistency may preclude the Court from determining whether the ALJ's decision is supported by substantial evidence. *Id.*

///

///

**B. Analysis**

Plaintiff makes three arguments related to the vocational hypothetical that the Court will address in turn. First, Plaintiff argues that the hypothetical question to the VE did not accurately reflect Plaintiff's limitations because it assumed that Plaintiff *graduated* high school. In a disability report completed in September 2009, Plaintiff stated that he did not graduate from high school. Tr. 321; *see also* Tr. 1030 (stating that Plaintiff did not complete high school). But the ALJ found that Plaintiff had at least a high school education. Tr. 40. Plaintiff testified before the ALJ that he completed 12th grade, and the hypothetical presented to the VE was based on this testimony. Tr. 55–56, 83. Plaintiff also told Dr. Webster that he had a 12th grade education. Tr. 1085.

Even assuming that the ALJ improperly equated "completing 12th grade" with "graduating high school," and that the hypothetical presented to the VE did not accurately reflect Plaintiff's education level, the inaccurate hypothetical was harmless error. A claimant's educational level can be a determinative element in applying the Medical Vocational Guidelines. But here, applying a grid rule for a younger individual who did not graduate high school and who can communicate in English would result in a non-disability finding. 20 C.F.R. Pt. 404, Subpt. P, App. 2. Moreover, the addresser job the VE identified (DOT code 209.587-010, SVP 2 unskilled work) is unskilled and does not require a high school education. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990) (SVP 2 corresponds with unskilled work); DOT 209.587-010, *available at* 1991 WL 671797; Tr. 41; *cf.* 20 C.F.R. § 416.964(b)(4) (noting that high school graduates can generally do semi-skilled or skilled jobs). Thus, the ALJ's possible error in stating that Plaintiff completed high school was harmless. *Tommasetti*, 533 F.3d at 1038 (harmless error exists when the ALJ's error was inconsequential to the ultimate nondisability determination);

*Stenson v. Astrue*, No. 11CV1054–BEN (BLM), 2012 WL 1154400, at *7 (S.D. Cal. 2012)

(finding harmless error even though a limitation was omitted from the hypothetical presented to

the ALJ).

Second, Plaintiff alleges that the hypothetical did not include the limitation to occasional

neck bending assessed by Dr. Plowman or the workplace limitation identified by Dr. Bee.

However, as the Court has already found that the ALJ properly considered Dr. Plowman's

assessment of Plaintiff's neck bending limitations and Dr. Bee's assessment of Plaintiff's work

limitations, Plaintiff's argument fails. *See Stubbs-Danielson*, 539 F.3d at 1175–76 (finding step

five finding valid where plaintiff "simply restate[d] her argument that the ALJ's RFC finding did

not account for all her limitations because the ALJ improperly discounted . . . the testimony of

medical experts").

Third, Plaintiff argues that the ALJ erred because the hypothetical to the VE did not

include a limitation to simple, routine, repetitive tasks, while the RFC finding did. Defendant

responds by arguing that Plaintiff has failed to show harmful error because a claimant's

limitation to simple, routine, and repetitive tasks encompasses GED reasoning Levels of 2 and

the addresser job identified by the VE has a GED reasoning Level of 2.

Rulings in the Ninth Circuit suggest that an RFC limitation to "simple," "routine," or

"repetitive" tasks is consistent with Level 2 reasoning. *See Rounds v. Comm'r Soc. Sec. Admin.*,

807 F.3d 996, 1004 n.6 (9th Cir. 2015) (noting that "[u]npublished decisions of panels of this

Court and opinions from some of our sister circuits have concluded that an RFC limitation to

'simple' or 'repetitive' tasks is consistent with Level Two reasoning"); *Watkins v. Comm'r Soc.*

*Sec. Admin.*, 2016 WL 4445467, at *7 n.2 (D. Or. Aug. 22, 2016) ("The District of Oregon

repeatedly has held that the limitation to perform simple and routine tasks is not inconsistent

with Reasoning Level 2 jobs."); *Maxwell v. Comm'r Soc. Sec. Admin.*, No. 3:12–cv–00475–HU, 2013 WL 4087758, at *19 (D. Or. Aug. 12, 2013) (finding limitations to "simple, routine instructions and procedures," and "simple, routine tasks" not inconsistent with Level 2 reasoning); *Patton v. Astrue*, No. 6:11–cv–06423, 2013 WL 705909, at *1 (D. Or. Feb. 25, 2013) (same). In contrast, the Ninth Circuit has found that "there is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning." *Zavalin*, 778 F.3d at 847.

The ALJ did not err given that he identified at least one job requiring only Level 2 reasoning and given that there are a significant amount of these positions in the regional economy. The addresser job identified by the VE has a reasoning Level of 2. DOT 209.587-010, *available at* 1991 WL 671797. Thus, the VE's testimony that Plaintiff was able to perform the job of addresser despite his limitations to "simple, routine, repetitive work" was not harmful error and constituted substantial evidence. *See Watkins*, 2016 WL 4445467, at *7 (finding that the ALJ did not err in failing to resolve any conflict between the DOT and the VE's testimony where the RFC limitation to simple work tasks was consistent with Level 2 reasoning and at least one job identified by the VE only required Level 2 reasoning). Further, the VE testified that there are 1,400 addresser positions in the regional economy (Oregon) and 187,000 addresser positions in the national economy. Tr. 84. The court finds that this is a significant amount of work. *See Thomas*, 278 F.3d at 960–61 (upholding the ALJ's finding that 1,300 jobs in Oregon constituted significant work).

## **IV. Medical Improvement**

Plaintiff contends that the ALJ improperly found medical improvement.

///

**A. Standards**

Generally, the claimant bears the burden of proving disability. *Meanel v Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). However, "[o]nce the claimant has been found to be disabled . . . a presumption of continuing disability arises in her favor." *Bellamy v. Sec. of Health and Human Servs.*, 755 F.2d 1380, 1381 (9th Cir. 1985). "The [Commissioner] then bears the burden of producing evidence sufficient to rebut this presumption of continuing disability." *Id.*

A claimant is "no longer entitled to benefits when substantial evidence demonstrates (1) there has been any medical improvement in the claimant's impairment and (2) the claimant is now able to engage in substantial gainful activity." *Attmore v. Colvin*, 827 F.3d 872, 873 (9th Cir. 2016) (internal quotations and citations omitted). In cases where the ALJ finds in a single decision that the claimant was disabled for a period of time but subsequently improved—such as here—"an ALJ should compare the medical evidence used to determine that the claimant was disabled with the medical evidence existing at the time of asserted medical improvement." *Id.* at 874.

**B. Analysis**

The Court finds that the ALJ has cited substantial evidence supporting the ALJ's finding of medical improvement, overcoming the presumption of continuing disability. The ALJ noted Martin Degroot, PAC's, examination of Plaintiff on November 11, 2013, and Plaintiff's testimony at the second hearing. Tr. 35. Mr. Degroot stated that Plaintiff reported that his symptoms of upper extremity paresthesias and weakness had significantly improved since his surgery on October 17, 2013. Tr. 1125. Plaintiff requested an extension of his narcotic medication and felt that his pain was controlled well with hydrocodone. Tr. 1125. Plaintiff agreed to taper his medication after one week. Tr. 1126.

Only one day after assuring Mr. Degroot that his pain had significantly improved and that his pain was controlled with hydrocodone, Plaintiff returned to Mr. Degroot "to discuss pain medications." Tr. 1111. After being issued 40 tabs of pain medication the day prior—enough to last a week—Plaintiff stated that his pain medication was not covering his pain. Tr. 1111, 1126. Plaintiff did not report any recent "accident, trauma or acute exacerbation of pain." Tr. 1111. Mr. Degroot reminded Plaintiff that he would not be prescribing him any further refills. Tr. 1112. The record does not contain any treatment records after this visit.

Furthermore, Plaintiff testified at the second hearing that "prior to surgery, his primary problems were pain and a weak grip." Tr. 35. "However, he testified that after surgery his primary symptom was tingling down the left arm into the hand." Tr. 35. The "main pain" in his hand and his grip problems had improved. Tr. 101. The ALJ found that this supported a finding of medical improvement related to the ability to work. Tr. 35.

Substantial evidence supports the ALJ's finding of medical improvement.

## Conclusion

For the reasons set out above, a judgment should be entered AFFIRMING the Commissioner's decision.

///

///

///

///

///

///

///

**Scheduling Order**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due  May 16, 2017 .  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 2nd day of May, 2017.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge